Algy, Inc. v. Commissioner.
Algy, Inc. v. Commissioner
Docket No. 33290.
United States Tax Court
1952 Tax Ct. Memo LEXIS 6; 11 T.C.M. (CCH) 1218; December 23, 1952
*6 Held: On the facts found, the debt owed petitioner by its president and largest stockholder, became uncollectible, i.e., worthless, and was properly deductible in the year 1944, pursuant to Section 23 (k) (1), I.R.C.
Arthur Richenthal, Esq., for the petitioner. Arthur L. Nims, III, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in taxes of the petitioner for the calendar year 1944, as follows: Taxes
Deficiency
Income
$ 7,469.56
Declared Value Excess Profits
798.63
Excess Profits
38,427.33
*7 Certain issues raised by the pleadings have been waived by petitioner. The sole issue remaining for our consideration and disposition is whether a debt owed petitioner by its president became worthless in 1944. Findings of Fact A portion of the facts have been stipulated. Such facts are so found and made a part hereof. Petitioner, Algy, Inc., is a corporation duly organized and existing under the laws of the State of New York. It maintains its principal office in New York, New York. Petitioner's initial capital was supplied by one Andrew Geller (hereinafter referred to as Andrew), who organized petitioner some time prior to 1920. Petitioner was, and now is, engaged in the business of retailing ladies' shoes and accessories. At all times herein material, petitioner kept its books and filed its income tax returns on an accrual basis by the calendar year. Its return for 1944, the year here involved, was so filed with the collector of internal revenue for the 3rd district of New York. On its 1944 tax return petitioner claimed a bad debt deduction in the sum of $147,991.01, which sum it claimed was the amount of a bad debt which was owed to it by Andrew and which it claimed had *8 become worthless in that year. [1]
During the years 1921 to 1931, inclusive, petitioner made a series of loans to Andrew. Such loans bore no interest and were not evidenced by promissory notes. Andrew made some repayments during this period. The amounts of the loans and the repayments and the annual balances thereof are reflected in the following tabulation: Year
Amount Due
1921
$246,217.20
1922
284,252.18
1923
328,122.09
1924
292,247.09
1925
292,963.44
1926
298,626.55
1927
303,216.18
1928
301,913.79
1929
225,991.01
1930
225,991.01
1931
147,991.01 No further loans were made after 1931, and no repayment was made after that date. Such loans, at all times herein material, were carried on petitioner's *9 books and records as "Loans Receivable" from Andrew. These loans were also included as "Loans Receivable" in the balance sheets attached to the income tax returns which were filed by petitioner. In 1944 petitioner wrote off its books and records as a bad debt the sum of $147,991.01 which it had thus been carrying as "Loans Receivable" from Andrew. At the time of the making of the loans and up to and including 1944, Andrew was president and one of the five directors of petitioner, the other four directors being his brothers. Also, from the time the loans were made through 1940, Andrew owned 50 per cent of the outstanding stock of petitioner entitled to vote. His five brothers and a sister were holders of the remaining outstanding voting stock of petitioner. After 1940 petitioner's stock was held by Andrew, his sister, and five brothers, as follows: Name
% Common
Andrew
45
Robert
16
Alfred
10
Harry
10
Tess
7
Max
7
Murray
5
The Geller family also held all of the stock in similar proportions in the following corporations: Andrew Geller Shoe Manufacturing Corp. Algy Shoes, Inc. Oxford Real Estate Corporation Fisher Building Alfred Geller (herein *10 referred to as Alfred) is the brother of Andrew and is 16 years younger than he. Alfred commenced working for petitioner in the early 1920s upon his finishing high school. This employment continued until 1945, during which period he was secretary and general manager of petitioner. At some time after he began working for petitioner, Alfred was permitted to purchase a 7 per cent interest in petitioner at a cost of approximately $21,000. After 1931 when Andrew ceased making any further payments on his indebtedness to petitioner, hardly a year went by that Alfred didn't mention the indebtedness to Andrew. He also had his brother, Harry, speak with Andrew about it several times. Each such approach was met with procrastination on Andrew's part and reassurances that the indebtedness would be taken care of shortly when his financial condition was somewhat improved. About 1933, Maurice Geller (hereinafter called Maurice), became petitioner's accountant. When he undertook such work, Maurice was told by Alfred to leave Andrew's indebtedness to petitioner as an account receivable, and that Andrew would pay it. Thereafter, Maurice spoke with Alfred and Andrew at least once each year about it. *11 On every such occasion, each would confirm the loan and state that it would be repaid. At all times while the indebtedness was outstanding, Andrew was solvent and financially able to pay his indebtedness to petitioner. His net worth during the period was never less than approximately $400,000. In 1931 his net worth was approximately $700,000. Andrew's fellow stockholders and directors had the greatest respect and veneration for him due to their close personal relationship and the fact that he had given them an opportunity to share in the business. They felt they had no reason to question his veracity or disbelieve his promises to pay. Throughout the entire period from 1931 to 1944, Andrew was at all times solvent. Petitioner carried a small number of accounts receivable representing customers' open accounts. It was company policy to make efforts to collect a slow account after 60 to 120 days by sending out certain form letters requesting payment, and then possibly to wait six months before turning it over for collection. On occasion, a debtor, upon request, would be granted an additional 30 to 60 days. The corporate policy in general was to enforce prompt collection of debts. *12 In 1940 Andrew made a gift of approximately 5 per cent of his stock in petitioner to two of his brothers. The value of the gift for gift tax purposes was derived from petitioner's balance sheet for the calendar year ended December 31, 1940. This balance sheet included Andrew's indebtedness to petitioner of $147,991.01 among the assets and in the net worth computed therefrom, from which the value of the gift was ascertained. Had the indebtedness not been so carried and recognized by Andrew in computing his gift tax for that year, his gift would have been valued at less than was reported. In 1944, Andrew sought to have his son and Robert's son taken into the business. The other family stockholders, principally Alfred, objected to such action lest it prove to be the opening wedge for allowing all of the sons and sons-in-law of the stockholders to come into the business, thereby eventually overloading petitioner with the family and possibly even injuring their own personal status. This objection caused animosity within the family for the first time in 25 years and seriously affected the harmonious relationship that had theretofore prevailed. The ill will and feelings thus engendered *13 were manifested in Andrew's positive refusal, when approached shortly thereafter in 1944, ever to repay his indebtedness. This was the first time that Andrew had ever voiced any such refusal. The other stockholders then decided to attempt the collection of the debt by resort to legal proceedings. Action on the debt was instituted by petitioner against Andrew in the Supreme Court of the State of New York for the county of New York on October 2, 1944. Andrew affirmatively pleaded the statute of limitations as bar to recovery thereon. Upon motion by Andrew, an order for summary judgment was entered by the court on November 20, 1944. A decision by the court dated November 15, 1944, and reported at page 1300 of the New York Law Journal reads, as follows: "NEW YORK SUPREME COURT, COUNTY OF NEW YORK SPECIAL TERM, PART III "Algy, Inc. Plaintiff against "Andrew Geller Defendant] Hon. Isidore Wasservogel Justice. * * *
"* * * The Plaintiff Corporation sues the defendant to recover the balance due on moneys loaned by plaintiff to defendant during the period from 1920 to 1931. No loans were made subsequent to 1931, nor has defendant since that year made any payments or written acknowledgment *14 of the indebtedness. The defendant owned 50 per cent of the stock of the plaintiff corporation up to 1940 and since then has owned 45 per cent. He has been president and a director of the plaintiff since 1921. Defendant moves for summary judgment on the ground that the statute of limitations bars the prosecution of the claim. No question of fact is presented and the only issue is whether the statute has been tolled by the defendant's continuance in office as president and as a director. The Appellate Division of this Department has ruled that such continuance in control does not toll the statute (Pollock v. Warner Bros. Pictures, Inc., 266 Appl. Div. 118). Motion for summary judgment granted. Settle order." * * *
Subsequently, pursuant to the foregoing decision, judgment was entered on behalf of the defendant, Andrew. Petitioner undertook no further legal action against Andrew to recover any of the loss occasioned thereby. Based upon Andrew's refusal in 1944 to pay his indebtedness then or thereafter and on the above ruling of the court, petitioner, in 1944, instructed its accountant to write off such indebtedness. As a result of the differences and feelings which arose because *15 of the position taken by Andrew with regard to paying his indebtedness to petitioner, Alfred, Harry, Murray and Theresa withdrew from the business, and in 1945 sold their interests therein to their brothers, Andrew and Robert. Petitioner realized gross income in the amount of $252,134.21 in 1944 and net income in the amount of $72,100.53, exclusive of the claimed deductions that were disallowed by respondent. The debt owed petitioner by Andrew became worthless and was properly deductible by petitioner in 1944. Opinion VAN FOSSAN, Judge: As pointed out above, certain of the issues raised in the petition upon which this action is based were waived by the petitioner at the hearing. Respondent's determination with regard thereto is accordingly sustained. The sole question remaining in dispute is whether the debt owed petitioner by its president and largest stockholder, Andrew, became worthless and was properly deductible in the year 1944, pursuant to section 23 (k) (1), Internal Revenue Code. [2] Petitioner asserts that it did. Respondent, for his part, does not question the existence of the debt, but takes the twofold position, first, that the debt became *16 worthless in 1937 upon the expiration of the statute of limitations, and, second, that in any event the debt may not be deducted as having become worthless within the taxable year "* * * because the action of petitioner's president and controlling stockholder rendered the debt uncollectible, this act being the equivalent of the voluntary release of a solvent debtor, which action precludes a bad debt deduction." The question thus presented is essentially one of fact. Those pertinent thereto have been fully set out above and need not be here repeated. Suffice it to say, we think that the facts found, based upon the evidence adduced, sustain petitioner's contention that the debt in question became uncollectible, and therefore worthless, in 1944, the year in which it was charged off and claimed as a deduction. While it be true that the statute of limitations appears to have run out on the debt in question in 1937, that fact in itself is insufficient to establish *17 the worthlessness thereof. Leo Stein, 4 B.T.A. 1016; Smyth v. Barneson, 181 Fed. (2d) 143, unless petitioner had reason to believe or to know that the debtor, Andrew, would rely thereon as a defense in bar of payment. Cf. $ Robert S. Dennison, 4 T.C. 806 [Dec. 14,406]. The running of the statute of limitations is a defense only. It does not wipe out the debt. Such fact does, however, place the burden on the petitioner to justify its charge off of the debt in a later year by showing either that something happened to toll the running of the statute or that it had substantial reason to believe that it might nevertheless eventually receive payment. See Mertens, Law of Federal Income Taxation, vol. 5, section 30.49; Duffin v. Lucas, 55 Fed. (2d) 786. The undisputed evidence is to the effect that Andrew was at all times material financially able to pay his indebtedness to petitioner. Moreover, when approached with regard thereto on several occasions, and at least once each year during the period from 1931 until 1944, Andrew orally reaffirmed his obligation and reiterated his intention to pay. The other stockholders of petitioner enjoyed *18 an harmonious personal and family relationship with the debtor throughout these years and caused petitioner to exercise forbearance in the collection of the debt. That these other stockholders had no reason to doubt the veracity of Andrew's oft declared intentions or to believe that he would invoke the statute of limitations to bar payment, is manifest. Thus, so long as Andrew's financial status remained unimpaired and he recognized his obligation to petitioner, the debt could not be deemed worthless. Smyth v. Barneson, supra.In 1944, however, conditions affecting the collectibility of the debt were materially changed, when, because of an intra family dispute, Andrew categorically announced his refusal to pay it then or thereafter. In the suit that was subsequently brought against him to enforce payment, Andrew was upheld in his affirmative plea of the statute of limitations as a bar to petitioner's collection. Respondent suggests, on brief, that the suit filed by petitioner against Andrew had many of the earmarks of a "friendly" suit, in that petitioner, the plaintiff therein, "* * * introduced no evidence which might have shown that the debt had been voluntarily extended *19 or renewed by the parties beyond the usual period of limitations * * *"; and that essentially "* * * the Court was merely asked to decide the narrow legal question whether the statute was tolled * * *" by reason of the defendant's relation to the plaintiff. However, it is within our judicial notice that, in New York, oral reaffirmances and promises to pay are insufficient to offset a plea of the limitation statute. See section 59, New York Civil Practices Act. Further, there appears to have been available little, if any, other pertinent evidence. In any event, the evidence as to the circumstances attendant upon the institution of the suit and as to the subsequent actions of all parties involved, we think, renders impossible the conclusion that there was a "friendly" family quarrel followed by a "friendly" suit entered into for tax purposes. Directly contradictory to such a conclusion is the action of the three brothers, and the sister withdrawing from the company and selling their stock shortly after the dispute arose. Although all of the evidence stands unchallenged in the record, respondent seeks now, on brief, to discredit the testimony on which much of it is based. Considering *20 the record as a whole, we are wholly unjustified in substituting surmise and conjecture for sworn and uncontradicted testimony. The argument advanced by respondent to support his alternative contention that, because of Andrew's dominant position in petitioner's affairs, the situation confronting us was the equivalent of a voluntary release of a solvent debtor, fails to impress us as more than speculation. The facts adduced from the uncontradicted evidence at hand simply do not support it. Hence, the cases cited by respondent relating to voluntary release of solvent debtors are of no application here. Moreover, Andrew held 45 per cent of the stock or less than control. The debt in question has been shown to have had potential value as of December 31, 1943. Cf. San Joaquin Brick Company v. Commissioner, 130 Fed. (2d) 220. The court proceeding wherein Andrew successfully pleaded the statute of limitations as a bar to the collection thereof is an identifiable event which ratifies our objective conclusion, based upon all the evidence of record, that such debt became worthless in the year 1944. See United States v. S. S. White Dental Mfg. Co. of Pennsylvania, 274 U.S. 398, 401. *21 Respondent's determination to the contrary is, therefore, reversed. Decision will be entered under Rule 50. Footnotes
1. Although the parties have so stipulated, no amount appears on the face of petitioner's 1944 return on line 20, which line is designated "Bad debts. (From Schedule G)." Nor is any amount entered therein in "Schedule G. - BAD DEBTS." Rather, such sum apparently was part of the amount of "Loss Resulting from Lawsuit", which amount was included in that appearing on the face of the return on line 29 designated as "Other deductions authorized by law."↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1)General rule. - Debts which become worthless within the taxable year * * *.↩